Edward C. **CELLA,** II, Plaintiff,

v.

**UNITED STATES** of America, Defendant.

No. F 89–30.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Nov. 5, 1991.

Order Granting in Part and Denying in Part Motion to Amend Judgment Feb. 12, 1992.

Terry A. Bell, The Bell Law Firm, Belle Chasse, LA, Dennis H. Geisleman, Myers & Geisleman, Fort Wayne, IN, for plaintiff.

David H. Miller, Asst. U.S. Atty., Thomas M. Moorhead, Douglas Powers, Fort Wayne, IN, Cary Wiener, Kirlin, Campbell & Keating, New York City, for defendant U.S.

## MEMORANDUM AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The following Findings of Fact and Conclusions of Law are entered pursuant to Federal Rules of Civil Procedure 52(a), after having examined the entire record and after determining the credibility of the witnesses.

### FINDINGS OF FACT

Defendant, United States of America, is the owner of the U.S.N.S. Hess, which was operated by Military Sea Lift Command and subcontracted to L.S.C. Marine who employed plaintiff, Edward Cella, to serve thereon as the chief cook from April 20, 1987 until May 20, 1987.

Plaintiff's various jobs took him to Seattle, Washington where, in approximately 1977, he accepted employment with Unisea Corporation. This position required him to relocate to Dutch Harbor, Alaska, where he was employed as a dinner chef at the Unisea Inn.

During this time that the plaintiff was a chef he was approached by various captains of the fishing fleets stationed there. He accepted a position in 1978 on the fishing vessel Kona as a cook, where he also operated and manned the vessel with the five other crew members.

In July, 1981 plaintiff was hired aboard the Pavlov, another fishing vessel, sailing out of Seattle. The plaintiff's duties were that of cook and deck hand. Part of cooking on the Pavlov involved bringing stores to the kitchen from below deck. To get to the lower deck and where the foods were stored plaintiff had to go through a small conning. This device was a raised protrusion from the deck, about ⅜″ steel with a plywood cover, approximately five by four, that plaintiff would lift up and use a hydraulic lever to bring the elevator up or down. Plaintiff would raise the lift to deck level, then climb over a small extension and step down into the deck. Plaintiff would then load stores and reverse the process to come back up to bring the stores one deck up to the galley. An accident[1] occurred August 2, 1981 when the

---

1. Prior to any injuries he sustained as a seaman, the plaintiff had been previously hospitalized for

a broken ankle from a skiing accident, an appendectomy and a pectoscomy, where his breast

plaintiff was using the hydraulic lever. The lever had apparently been leaking hydraulic fluid. The plaintiff slipped in the hydraulic fluid and went flat on his back and was knocked unconscious for several minutes. It was three days before the plaintiff was lifted by the Coast Guard and eventually flown to a hospital in Anchorage, Alaska. Spinal films were done, which were read as normal. Plaintiff was only treated with analgesics and physiotherapy.

Plaintiff returned to Indiana, where he began noticing pain in his right eye and associated blurred vision. In September, 1981 he was seen by an orthopedic surgeon in Fort Wayne who obtained additional x-rays of the spine and continued therapy through November, 1981. Plaintiff returned to Seattle where he was seen in the Seattle Eye Clinic because of continued symptoms of blurred vision, however, all tests proved to be normal.

On December 1, 1981, plaintiff was placed in traction during physical therapy, and while in traction plaintiff complained of being light-headed and having increased neck pain. Plaintiff later became nauseated and experienced vomiting which lasted throughout the day and night. The following morning plaintiff admitted himself into the emergency room at the Seattle Public Health Hospital. Plaintiff complained to doctors that he had pain shooting up and down both arms periodically and periodically he experienced numbness in all four extremities. He also complained that after walking ten to fifteen minutes he was totally exhausted. Plaintiff admitted to severe depression relating to his inability to work and take care of his family. The hospital conducted x-rays which indicated a fracture of his C–5 cervical vertebrae, however after a re-evaluation by the orthopedic surgeon, it was determined that plaintiff's neck was stable and that no further diagnostic or therapeutic intervention should be made. For his back pain, plaintiff was given

Robaxin and was told to continue physical therapy.

With respect to the pain to his eyes, the neurologist suggested that if he should continue to have these complaints, a diagnosis of migraine headaches should be considered and appropriately treated. Finally, the plaintiff was seen in consultation by a psychologist, who noted that there were significant familial and marital problems [2] and should he continue to be depressed, antidepressants should be considered in the future.

The laboratory studies that were administered on the plaintiff on December 7, 1981 revealed that his blood serum levels were abnormally high. CPK, normal is 0 to 225; for the plaintiff the reading was 3,545. LDH, normal is 60 to 200; result for plaintiff was 262. SGOT, normal is 0 to 41; plaintiff's was 89. Finally, SGPT, the normal range is 0 to 36; plaintiff's was 154.

Shortly after his discharge from the hospital, plaintiff returned to Fort Wayne and on June 11, 1982 began seeing Dr. Michael Arata, an orthopedic surgeon. The plaintiff informed Dr. Arata that during the preceding 6 months he had continued to have regular physical therapy three or four times weekly, however, during the preceding month before he saw Dr. Arata, he had not been under the care of a local doctor, and without the physical therapy, he felt his problems had worsened.

Dr. Arata conducted a physical exam which revealed that plaintiff's cervical spinal motion in all planes was limited approximately 50%. Plaintiff's motor strength was tested, and appeared to be normal. Triceps, biceps and brachialis reflexes were all intact in the upper extremity. Dr. Arata also noted that the plaintiff had some depression and other non-medical problems that were still present and this may have entered into plaintiff's physical problems in some way. Dr. Arata recommended that the plaintiff continue with phys-

plate was cut back to reduce the binding of his ribs.

2. Plaintiff has been married and divorced twice. The first marriage occurred in 1971 and lasted approximately three years, however, plaintiff and his first wife were separated in 1972. Plaintiff lived with his first wife in Wakefield, Mass. and had one child during the marriage. The plaintiff married a second time in July, 1980 in Anchorage, Alaska. The marriage was tumultuous and the couple separated in 1985 and were divorced in 1988.

ical therapy and placed him on Oraflex, an anti-inflammatory medicine.

Dr. Arata next saw the plaintiff on June 25, 1982 and it appeared the Oraflex worked extremely well and the transcutaneous stimulation units ("T.E.N.S. unit") allowed the plaintiff to sleep at night and provide considerable relief. Plaintiff was allowed to continue the isometric exercises and physical therapy and was to be seen only as needed.

On October 10, 1982, the plaintiff went to the emergency room at Parkview Memorial Hospital complaining of spasm in his cervical and thoracic spine, his neck and upper spine, numbness in three fingers in his right hand and numbness in his whole left arm. When Dr. Arata saw the plaintiff the conditions had subsided spontaneously and the plaintiff was doing fine. Dr. Arata then examined the plaintiff; however all tests proved negative. Dr. Arata thereafter prescribed plaintiff Flexoril, a muscle relaxer.

On November 10, 1982 plaintiff called the doctor's office, and was very upset, complaining of muscle spasms and pain in both his neck and back. He also complained of dehydration and vomiting and wanted to see the doctor or return to emergency room. Since Dr. Arata was unavailable, the nurse consulted with another doctor who gave the plaintiff permission to go to emergency room. Plaintiff was treated by the hospital doctors and released.

On December 12, 1982 plaintiff visited Dr. Arata for neck spasms. Dr. Arata could not find anything objectively wrong but told plaintiff to stay in bed and gave him a strong pain killer.

On February 3, 1983, the plaintiff called the office and complained of deep muscle spasm in the neck after an evening of bowling. Dr. Arata again prescribed a pain killer.

On March 15, 1983, plaintiff asked that Dr. Arata write a note to his lawyer recommending massage therapy. On August 3, 1983, again at plaintiff's request, Dr. Arata dictated a letter stating that plaintiff was physically fit and ready for work.

On November 12, 1983, the plaintiff called to tell Dr. Arata that he had been getting along very well and that he had returned to work, but that he had been involved in a traffic accident. His symptoms did not sound severe, so Dr. Arata telephoned in a prescription for a muscle relaxant accompanied with an instruction to call the first of the week if plaintiff was having any problems. X-rays were later taken of the plaintiff on November 28, 1983. The impression of the radiologist was that plaintiff had a normal cervical spine and normal dorsal spine.

On December 19, 1984 plaintiff complained of cervical pain and thoracic pain. Plaintiff felt as if there was a spasm which was causing his head to pull forward. The neurological exam was also negative and the outside x-rays were negative also. Plaintiff asked to be referred to a chiropractor.

While he awaited word on his application to become a merchant marine, plaintiff worked several odd jobs in the Fort Wayne area. Plaintiff eventually received his documents in 1984. The first vessel he boarded was the S.S. Independence, a passenger cruise ship on which plaintiff was a second cook and worked as a floater, rotating through different stations that needed assistance.

In 1986, plaintiff received a security clearance and was invited to worked with the Tagos operation, aboard the U.S.N.S. Contender, a classified military operation. Plaintiff was chief cook and chief steward on two different operations, which involved two back-to-back 90 day operations. Plaintiff experienced no spasms or numbness during the 180 days at sea.

While aboard the U.S.N.S. Contender, plaintiff was informed that there were opportunities with the Lavino Shipping aboard the U.S.N.S. Harkness. Plaintiff was hired as chief steward, with a 21 member department and a crew of approximately 328. As chief steward, plaintiff was responsible for the entire department, including inventory, provisioning the ship for up to six months at a time, feeding the crew, which meant being responsible for all galley spaces, all inventories, the many store rooms and expediting the vessel's passage in and out of port. Plaintiff was aboard the U.S.N.S. Harkness

approximately 32 days before he bruised his hip and shoulder sliding down a ladder. The nurse aboard the Harkness examined the bruise and advised the plaintiff to return home to get some x-rays. Plaintiff was considered unfit for duty for approximately 30 days.

Plaintiff obtained a pre-board physical examination from Seafarers Medical Department in Brooklyn, New York on February 20, 1987. Plaintiff received a "fit for duty" notice, however, the report of medical history neither disclosed his pre-existing back condition nor the maladies he complained of after the accident on the Pavlov. Notwithstanding the nondisclosure of prior ailments, the court finds that plaintiff was symptom free at the time of his physical.

After notifying the company that he was fit for duty, the plaintiff was offered the position of chief cook on the U.S.N.S. Hess in April, 1987. Plaintiff was told that it was a 30 day relief job because they were unable to get a cook for the vessel. Plaintiff boarded the vessel April 20, 1987 in Oakland, California at approximately 3:00 P.M.

After a quick walk-through, plaintiff determined the spaces had been neglected for some time. He observed a general disarray, with storage lying loose and unstowed in passage ways. There did not appear to be any inventory control. Plaintiff then went below to the chief steward's berth and introduced himself, indicating that he would like a berth and would like to start working. The chief steward told plaintiff that he was taking a nap and that plaintiff was to sit down in a chair and wait for him to get up. Plaintiff refused and left. He then introduced himself to the captain. Plaintiff told the captain of his plans for the running of the galley and the steward department. The captain advised the plaintiff that his duties would be those as directed by the chief steward. Plaintiff then immediately went to work to try and put the galley in some order.

On the Hess there was a 12 member crew in the steward's department.[3] The steward department was responsible for both housekeeping and food service. The chief steward was in charge of the of the whole department. The chief cook was in charge of the galley. He had two cooks working under him, the cook/baker and the assistant cook/utility. The chief cook prepared two meals with six entrees. The chief cook had authority over the two cooks and the galley and, as assigned, a roving steward assistant. The duty of the cook/baker was to make the baked goods and to prepare and serve breakfast. The cook/utility prepared the vegetables, kept the vegetable box clean and washed all galley utensils. Steward assistants were the clean-up crew; they made the beds, cleaned the pantry ways, helped serve the food, and worked as messmen. The entire steward department was responsible for loading stores. The deck department took the stores off the dock and placed them on ship. The steward department then situated the stores into their respective places.

On the second or third day aboard the vessel, a truckload of stores was delivered to the vessel. Other than the deck crew, several steward assistants refused to assist the plaintiff in receiving the stores. Instead, they continued to check-off the stores delivered. Because the stores included perishables that needed to be handled immediately, plaintiff decided to move the goods with assistance from several members of the deck department. Plaintiff unloaded approximately four pallets, however, just as he finished, he felt his lower back give out and he fell down to the deck and laid there for approximately 15 minutes. After the pain had left, plaintiff went back to work. After his shift, plaintiff went to lay down and later that night reported to the ship's nurse to get a couple of aspirins.

On sailing day, the engineering officers went down to the engine room to bring up steam and put power to the plant. During

3. The manning scale for the U.S.N.S. Hess, as certified by the Coast Guard and the union contract, indicated the number of crew requirements for the vessel was 29. The Deck Department required a Bosun, 6 Able Seaman and 3 Ordinaries. The Engineering Department required an Electrician, a Reefer, 3 O.M.U's and a General Utility, while the Steward Department required a Steward, Cook, Cook/Baker, Assistant Cook/Utility, 8 Steward Assistants and 1 Purser/Storekeeper.

the period in port, the first engineer had overhauled the astern stop valve and when he put power to the throttle in the main plant, he had not correctly seated the astern stop valve and there existed enough of a leak through to generate a speed of approximately slow astern. When the steam was put to the unit, the vessel started going astern and ultimately broke its mooring lines. Plaintiff was in the galley unloading stores and when the vessel lurched, the plaintiff bumped his head on the forehead just above the hairline. After the ship had stopped, the plaintiff then sat down on the counter top and he bumped his head again and then fell backwards on his posterior. Plaintiff did not receive any treatment, the nurse was not on board and he felt he had too much work to do to stop for injuries.

The steward department aboard the Hess was chaotic and unorganized. As chief cook, plaintiff was not even given keys to access any of the galley areas; the keys were in the possession of steward William Lacy. The conditions of the department generally broke down along racial lines. Of the 12 member crew, only half of the department worked on a regular basis.[4] The conditions of the department changed for the worse once Chief Steward Spence took over. The discipline and morale of the people he brought aboard was lacking.[5]

The stewards assistants, other than the assistant cooks, treated plaintiff with disrespect. When asked to assist plaintiff in the galley, they refused, stating they only took orders from the chief steward. On one occasion, a steward assistant told the plaintiff that the chief steward told him specifically not to do any work for the plaintiff.

The chaotic conditions of the stewards department contributed to two injuries complained of by the plaintiff. In one incident, no pot washer had been assigned to the galley and the chief steward ordered cooks to wash their own pots. While lifting a 14 pound stock pot full of simmering spaghetti sauce, plaintiff lost his grip of the pan because butter had not been washed off the handle. In dropping the pot, the simmering spaghetti sauce burned his hand. Plaintiff did not seek medical attention immediately, waiting until after his shift to put sulfur iodine on the burn.

The second injury occurred when the plaintiff was lifting a roaster from the oven. There were approximately 90 pounds of meat in the pan. When plaintiff attempted to removed the pan without any assistance, his back went out completely and it was very hard for the plaintiff to walk. Plaintiff saw the nurse the next day and was instructed not to do any further lifting. The nurse wanted to admit the plaintiff to sick bay, but he told the nurse he was fine and that he wanted to continue to work. The chief steward was informed that plaintiff was not to do any lifting, however, no one was assigned to assist the plaintiff.

On May 8, 1987, plaintiff, the deck department, the engine department and two members of the steward department formulated a letter citing a list of complaints in response to some of the conditions on board the Hess.[6]

---

4. Eddie Sessions and Donn Reed both testified as to the working habits of several of the steward assistants. Julie Green, only cut hair, and it was questioned whether this was her official duty or a side job. Vitorino Elmaro was apparently the chief steward's lackey. William Lacy was responsible for making beds, however, he just "basically walked around doing nothing." Finally, Bryan Stephens was a messman, however, his job appeared to consist of doing nothing other than making threats against others.

5. Both Mr. Sessions and Mr. Reed agreed that the Hess was one of the worst vessels they had ever been on. The noise, name calling, suspected drug use and racial tension made the voyage unbearable. If either were offered a position on the Hess under similar conditions, they would decline the offer.

6. To: Master
Re: Stw. Dept
Fr. Chief cook

8 May 87

Let it be known that upon my arrival to the Hess 19 April 87, I, was informed by current chief steward, to wait in his office while he took a nap, I thought this strange, being 1400 hrs. or there abouts, & since no stores came aboard until 21 April, & no night work is done in port, to wait for the steward to take a nap before i could get a berth seemed contrary to his function.

when the steward awoke he assigned me my quarters. & informed me of my duties & position, which in essence was not chief cook at all (list to follow)

After plaintiff received threats to his personal safety, he tried to follow union procedures and go through the ship's chairman, however, there was no chairman on board.[7] The deck department delivered the letter to the chief mate, however, the letter was returned with no action. Since there was no response from the chief mate, plaintiff personally presented the letter to the captain. The captain, the chief steward and plaintiff sat down and discussed each of the points in the letter. The chief steward "jumped up and down and sweared [sic] vulgarity, ranted and raved, said it was his department he was going to run it the way he wanted." The captain "sat back and said 'I'm going to back up my chief steward.' ..." Trial Transcript, 9/12/90 at 205. Plaintiff received the letter back with his overtime sheets[8] and was told to bring

> When I inquired about the sad state of the stores, & storage areas, I was informed that all stores, & storage spaces would be handled on an overtime basis, & not during regular hours, which is what one would normally expect, having worked for L.S.C. in the past I know this to be contrary to co. policy.
>
> My first meeting with the steward ended with my being ordered to write the next evenings menu, clearly the responsibility of the chief steward.
>
> since that first encounter there have been many meetings with the steward, all fruitless, the man illustrates no cooking or management experience at all.
>
> The following are a list of what I, believe are violations of L.S.C., & S.I.U. policy, & standards, as well as sea going courtesy.
>
> 1. chf ck not allowed in pantry areas
> 2. chf ck ordered not to train anyone
> 3. ordered not to stow stores during regular hours
> 4. ordered not to direct any messman, no chain of command
> 5. chf issued no keys to any galley spaces
> 6. no permanent pot washer, baker, asst ck & chf ck ordered to wash pots
> 7. messman are continually late for there shift, & allowed to do so
> 8. mssmn speak with disrespect, & vulgarity to cf ck, & baker
> 9. no inventory kept by stew. items appear on menu that do not exist
> 10. no stock rotation in practice, cause of much waste, no survey list kept
> 11. no meal cost log kept
> 12. stew. has no regard or understanding of cooking times ie: turkeys for lunch
> 13. poor menu planning causes much waste
> 14. bakers schedule conflicts with meal preparation & execution
> 15. Stew. watches TV thru nite lunch, supervises nothing, & submits O.T.
> 16. ovens and other equip being turned off when chf ck out of galley
> 17. breakouts have been assigned to chief ck as stew. does not know amounts to pull
> 18. fresh milk for 7 days only (a sin)
> 19. All storage areas are below standards & much OT has already been spent
> 20. menu posted as late as 2200 hrs, not 2 days in advance as is expected
> 21. stew, informed weevils in dry stores 1 May, nothing done until nurse informed 5 May

> 22. chf ck instructed not to feed night watch, yet messman are allowed
> These are a few of the intolerable conditions stemming from the dept. whose function is to serve.
> I have witnessed those violations indicated by the numerals by my signature.
> N.B.
> 23. threats have been made against my food or my person
> 24. Toilet items not being made readily available
> [sic], [Following were a list of dates of the alleged violations and signatures of seven crew members.]

7. Seafarers International Union Of America agreement for settlement of grievances provides, in pertinent part:

> Sec. 2. Grievance Committee. For the adjustment of any grievance arising in connection with the performance of this Agreement which cannot be satisfactorily adjusted on board the vessel there shall be established a Grievance Committee, which shall meet in Pennsylvania unless otherwise mutually agreed.
>
> \* \* \* \* \* \*
>
> Section 31. Unlicensed personnel shall elect from the various unlicensed ratings a Ship's Chairman, Secretary Reporter, Educational Director and a department delegate from each Unlicensed Department.
> They shall perform the customary duties of the various designations and hold regular meetings for the purpose of resolving any disputes or complaints that can be resolved aboard ship. A complaint or dispute that cannot be resolved aboard ship are to be referred to the Union Headquarters.
> Sec. 2. All shipboard grievances must be filed by the Unlicensed Crew member no later than 15 days after date of payoff.

8. Plaintiff alleged he worked an excessive amount of overtime and that the time sheets that he submitted to the chief steward did not accurately reflect the total number of overtime hours that were eventually submitted for payment. Plaintiff, however, submitted no evidence or testimony on which this court could determine the number of overtime hours he alleges he did

his complaints to the attention of the union. More concerned with his medical problems than the conditions of the vessel, plaintiff never pursued it.[9]

On approximately May 13, 1987 plaintiff admitted himself to sick bay. The captain was informed that the plaintiff injured himself on the 6th of May and that the nurse was going to keep him there for observation. The captain told the nurse to keep him there for the rest of the voyage because if the plaintiff had a back injury, he did not want the plaintiff to complicate it by continuing to work.

On May 16, 1987 the plaintiff informed the nurse that he felt better and wanted to return back to work. However, the plaintiff was kept in sick bay until they reached port. Plaintiff was instructed to see a medical doctor to determine whether he was fit for duty.

While confined to sick bay, the plaintiff was the subject of several threats from assistant stewards, specifically from William Lacy, who regularly displayed his butterfly knife while threatening the white crew members. In a conversation with Eddie Sessions, Lacy asked Sessions, "how's your friend doing?", referring to Mr. Cella. Sessions responded "Well, we're doing our best to look after him." Lacy replied, "Well, there's a lot that can happen between here and San Fran-

cisco." Another steward assistant, Bryan Stephens, was heard to have called plaintiff "white scumbag," and "asshole" and stated that plaintiff "would get his when we get to port."

The captain,[10] unaware of the specific incidents of threats against Mr. Cella, did acknowledge that he had better steward departments, however, in comparison to other ships, he thought the steward's department on the Hess was average[11].

On May 18, 1987, once the Hess docked in San Diego, plaintiff received a master certificate to take ashore to receive a medical examination. The document only made a reference to complaints of chronic back pain, however, plaintiff also complained that he was very weak, having difficulty getting up the ladder wells throughout the ship and that his appetite had disappeared completely.

After plaintiff was examined at the San Diego hospital for his injuries sustained while on the Hess,[12] the plaintiff returned to Fort Wayne and was under the care of Dr. Arata. On August 28, 1987 plaintiff reported to Dr. Arata and presented him with x-rays from his chiropractor. Plaintiff informed Dr. Arata that he had injured his thoracic and lumbar spine in another accident aboard a vessel and was hospitalized for six days. Plaintiff

work. In order to have a valid overtime sheet, three signatures were required—the seaman, the chief steward and the captain. If the seaman worked the midnight rotation, then the commander of the Naval unit had to sign the sheet in order for it to be paid. After carefully reviewing the time sheets and calculating the total number of overtime hours, the court found plaintiff averaged a 10.42 hour work day or 2.42 hours of overtime. The court, however, does not find this amount of overtime excessive.

9. Both the chief steward and the captain testified that they never saw the letter prior to trial. The court however does not find their testimony credible, especially when signatories of the document testified to the contrary, and the letter contained approximately seven signatures of crew members from the Hess and dates of the alleged violations.

10. Although denied by the captain, Eddie Sessions testified that although the captain was well respected because of his many years as a seaman, the crew thought the captain was a drunkard. Mr. Sessions stated that for the entire time he was aboard the Hess, every night he would

deliver a bucket of ice to the captains quarters. On several occasions the captain would ask Mr. Sessions to join him in a round of drinks.

11. The unlicensed civilian crew of the Hess was obtained through the S.I.U. union hall. The captain would notify the company of any expected vacancies and they would in turn contact the union hall. The same process was in effect for the officers, only it was through a different union. The union would send a seaman in the given required rate to crew the vessel. Other than a department head asking the seaman's work history, there was no other personnel screening process by the shipowner as to whether the seaman was competent in his given rate.

12. Plaintiff testified on cross-examination that although the documents from the hospital indicated that he was examined and that he could return to work on June 7, 1987, he contends that there was only a verbal conversation and that he was not in fact examined. The doctor relied upon the plaintiff's past medical records, and merely instructed him to go home and rest for a couple of weeks.

complained of back pain with no radicular sounding symptoms. During the examination, plaintiff demonstrated some discomfort in his thoracic and lumbar region of the spine, however, tests indicated he was neurologically intact. Dr. Arata recommended a pain clinic evaluation. The x-rays from the chiropractor were of poor quality and incomplete, nevertheless, Dr. Arata thought the plaintiff's symptoms were muscular in nature and should be treated with conservative measures. Plaintiff's x-rays were reviewed by three separate doctors (associates of Dr. Arata) and while all were normal, it was agreed to refer plaintiff to Dr. Louis Romain, a local physician practicing in the field of neurology.

On July 21, 1988, plaintiff called Dr. Arata's office and requested Valium to relieve muscle spasms. He was dispensed a non-refillable order of 26 tablets. Dr. Arata told the plaintiff that if they could not develop a more definite diagnosis, he would be happy to refer plaintiff to the Cleveland or Mayo Clinic. Dr. Arata also referred the plaintiff to a pain clinic because plaintiff was non-operable and had a chronic condition that was not responsive to the treatments prescribed.

Plaintiff was first examined by Dr. Romain on June 3, 1988. After taking a history of the plaintiff, Dr. Romain conducted a neurological examination. Dr. Romain's examination revealed proximal muscle weakness, two units in the right deltoid, one unit in the left deltoid in a zero to minus four schema. There was also an increase in reflex activity that was striking in the upper extremity, the reflexes being three units, normally only being two in a system of zero to four. He also had a positive Tinel's sign [13]. Plaintiff's ability to feel superficial pain and light touch in the right upper extremity decreased, specifi-

cally down the arm and into the hand over the area of the right thumb. Also there was some involuntary movements of the tongue. Additionally, the scapulae, the triangle shaped bones over the upper back, seemed to be very prominent on both sides. There was also the presence of an increase in tone in the muscle adjacent to the spine in the low back, plus restrictions in movement in the lower back. Finally, Dr. Romain detected a tenderness of the muscles in the upper extremities.

Dr. Romain's preliminary diagnosis questioned whether plaintiff's ailments was some type of process originating in the brain, perhaps in the brachial plexus.[14] The other thought was whether this was a type of neuromuscular affliction or peculiarity, such as myofascitis.[15] Dr. Romain also considered conditions such as collagen disease,[16] some type of nerve or root injury, or some type of neuritis.

On June 15, 1988 Dr. Romain conducted a series of tests to begin to rule out various possibilities. The first step was a myelogram of the spine and a complete spinal fluid analysis. Dr. Romain also repeated testing the plaintiff's muscle enzymes and found they were elevated. Dr. Romain further determined that there was indeed some involvement of the C-6 nerve root and that there was some cervical spondylosis (vertebra stiffening). However, Dr. Romain felt this may be a portion, but not the full extent of the clinical problem. With the persistent enzyme elevations, in the thousands, Dr. Romain suggested that the plaintiff undergo a muscle biopsy of both the upper and lower extremities closest to the muscles of the shoulder and thigh, as well as the muscles of

13. Cutaneous tingling sensation produced by pressing on or tapping the nerve which has been damaged or is regenerating follow trauma.

14. Network of lower cervical and upper dorsal spinal nerves supplying the arm, forearm and hand.

15. Inflamed condition of a muscle and its fascia.

16. A group of diseases of the connective tissue that share anatomical and pathological features. The etiology of these diseases is unknown, thus,

they are grouped together on the basis of common clinical signs and symptoms. Generalized inflammation of connective tissue and blood vessels is usually seen, and in some cases fibrinoid deposition in connective tissue fibers and blood vessels is present. Diseases presently included in this category are: cutaneous and systemic lupus erythatosus; progressive systemic sclerosis; scleroderma; polymyositis and dermatomyositis; and polyarteritis. Taber's *Cyclopedia Medical Dictionary* 309 (14th ed. 1981).

the middle of the body, the thorax, the abdomen and the neck.

On August 1, 1988, two muscle biopsies were performed on the plaintiff, and the specimens were sent to the Armed Forces Institute of Pathology (AFIP) in Washington, D.C. A small amount of tissue was taken for a local study by Dr. Charles M. Pan. Dr. Pan's diagnosis was that of focal chronic interstitial myositis.[17] Dr. Pan opined that what was found in this muscle biopsy could not be part of a more widespread condition in plaintiff's body because the biopsy was localized. He agreed that through a clinical diagnosis and a further history and examination of a patient, combined with his findings in the biopsy, another diagnosis could be made. The biopsy results from the Armed Forces Institute of Pathology were the same as Dr. Pan's. The AFIP diagnosis and report indicated that a clinical diagnosis could be consistent with polymyositis.

After a review of these diagnoses, Dr. Romain was convinced plaintiff suffered from an inflammatory process in the muscles,[18] a type of myositis that involved certainly not only the upper extremities but also the lower extremities. Even though plaintiff was having a bit more trouble with the arms, he was also having problems with the legs. The biopsies showed that the tissues from these different sites were almost indistinguishable, thus the process could certainly be generalized.

When questioned as to his opinion regarding the cause of plaintiff's condition, Dr. Romain stated that although he had heard of cases of polymyositis being secondary to trauma, as a neurologist, he knew the generally accepted dogma identified plaintiff's condition as an idiopathic disorder. For that reason, Dr. Romain conducted a search of medical literature to ascertain whether there were cases that would support his conclusion that the disorder came about from the trauma and emotional stress plaintiff was subjected to aboard the Hess.[19]

. Dr. Romain found several proposed possible causes of polymyositis or polymyositis-like diseases or conditions, such as viral infections, vaccinations, some tropical diseases and systemic lupus erythematosus. However, through his physical examination, testing and history of the plaintiff, Dr. Romain was able to rule out these causes as the reason for plaintiff's condition. The medical literature further revealed that cases of polymyositis are heterogenous, yet there was always a consistent but somewhat low percent of cases in which there has been some type of severe emotional or physical stress that seemed to have an etiological importance in the genesis of disease.

An experimental model with marathon runners found that after a long distance run there was a remarkable increase of the enzyme CPK, among other things, into the

17. Inflammation of muscle tissue, especially voluntary muscles with excessive proliferation of normal cells in the normal tissue arrangement of the muscle. Taber's *Cyclopedia Medical Dictionary* 928 (14th ed. 1981).

18. Dr. Romain used the terms "polymyositis", "inflammatory disorder of the muscle", and "polymyositis-like disease or condition" interchangeably. All the treatment modalities are basically the same, therefore it is not imperative to pin plaintiff's condition to any particular term.

19. Dr. Romain proceeded with his search by using the St. Joseph Medical Center computer to conduct a world-wide search for cases of polymyositis that were related to trauma. In addition, Dr. Romain requested cases in which he could review the relationship of elevated enzymes to disease states of the muscle. He was also interested in knowing of causes of inflammation of muscles in both local areas and generalized distributions. Finally, Dr. Romain was interested in knowing if there was any type of

experimental model in humans that might allow him to look into the problem of persistent elevated enzymes, elevation in muscle disease, especially if there was any type of model in which there was some type of relationship between physical and emotional stress and then production of polymyositis-like picture, reversible or not.

Dr. Romain's search included twenty-two (22) articles in several different languages. The defendants also introduced six articles. The court reviewed these articles and finds that on the whole, they support the court's conclusion that there is no inherent conflict between the general conclusions of these articles regarding the etiology of polymyositis and Dr. Romain's clinical diagnosis in this case, that plaintiff's condition was caused by the events complained of on the Hess. Many of the articles admit to the possibility that polymyositis may be caused by trauma and stress, as the plaintiff contends.

blood stream. Muscles release these enzymes, thereby forming a link between physical stress and elevated enzymes. After some rest, the enzyme levels come back down and the muscles repaired themselves. To avoid injuries, in recent years, marathon runners have been selecting their races with extreme care; running two to three races a year. Even in good physical condition, the muscles are not able to take the torture of such physical and mental endurance very often. Dr. Romain testified that plaintiff's condition would be analogous to that of a marathon runner, through the physical exertion, trauma, and stress he was subjected to aboard the Hess. When plaintiff began to incur these types of muscle changes, however, unlike the marathon runner, his body was unable to recover.

Based upon all the medical evidence, the court finds by a preponderance of the evidence that plaintiff's condition was, in fact, caused by the trauma and emotional stress that plaintiff suffered aboard the Hess.[20]

Dr. Romain felt the appropriate plan of treatment for plaintiff was prednisone and physical therapy. Individuals with polymyositis are actually allergic to some of the constituents within their own bloodstream, therefore, it is necessary to halt the inflammatory reaction in the muscle. By giving the prednisone, the inflammatory reaction is abated, allowing the muscle to strengthen itself. The physical therapy allows muscles to be exercised, building strength within the muscle and encouraging the growth of nerves. A very mild and gentle physical therapy would allow for the removal of some of the toxins that are in the muscles, and would also allow a richer blood flow into the muscles. The muscle would hopefully regain some of the strength lost as a result of the inflammation.

In describing the initial manifestations of the condition,[21] Dr. Romain's diagnosis noted that the most common complaint of polymyositis was proximal muscle weakness of the muscles close to the spinal cord. The condition also involves the muscles used in swallowing and chewing, the muscles of the neck. Polymyositis likewise adversely effects walking, especially climbing steps. Additionally, it affects the general energy level.

Another hallmark of the disease is fatigue. Afflicted persons may not be terribly weak, but the most minor effort produces weakness. So the individuals may be functionally incapacitated to a very marked extent, even though they may be able to walk around.

As the treating physician, Dr. Romain opined the most likely course of treatment in plaintiff's case would be to simply "arrest the progress of the disease." Moreover, Dr. Romain testified that plaintiff's disorder is life threatening, in which one-third of the patients that have the condition die. Death is caused from involvement of the muscles of the diaphragm, preventing the patient from breathing. Additionally, the medical literature introduced at trial supported Dr. Romain's diagnosis, including that the mortality

20. The defendant has argued that plaintiff's condition actually existed before plaintiff's service on the Hess. The plaintiff's symptoms and his elevated blood enzymes in the early 1980's clearly raise this suspicion. However, no clinical diagnosis or other supporting medical evidence was offered to support this proposition. While the court finds, as indicated above, that the preponderance of the evidence establishes that plaintiff's medical condition was caused by the events on the Hess, it is clear beyond any peradventure of a doubt that even if the plaintiff was afflicted with polymyositis prior to 1987, he was completely asymptomatic at the time he entered into service upon the Hess; the events complained of upon the Hess clearly aggravated plaintiff's condition, caused him to become symptomatic, and proximately caused his current condition which has deteriorated continuously since his service on the Hess.

21. Criteria which lead to the diagnosis of polymyositis-dermatomyositis: (a) symmetrical proximal muscle weakness with or without dysphagia and respiratory muscle weakness; (b) Elevation of the serum enzymes, especially the CPK, but also the transaminase, the LDH, and the aldolase; (c) the electromyographic triad of (i) small amplitude, short duration, polyphasic motor unit potentials, (ii) fibrillations, positive waves, increased insertional irritability, and (iii) spontaneous bizarre high frequency discharges; (d) Muscle biopsy admoralities of degeneration, necrosis, phagocytosis, and an interstitial mononuclear infiltrate; and (e) the typical skin rash of dermatomyositis. Bohan, *Polymyositis and Dermatomyositis*, 292 N.Engl.J.Med. 344, 403, (1975).

rate of individuals with polymyositis is four times that of the general population. In contrast to Dr. Romain's opinion and the medical literature, Dr. Yogesh Amin, plaintiff's current physician stated that with proper treatment, plaintiff's condition is likely to remain stable and cause no reduction in plaintiff's life expectancy. After carefully reviewing the medical testimony and the medical literature introduced, the court is convinced that the debilitating nature of the disease would decrease the plaintiff's life expectancy to a significant degree. Thus, the court finds plaintiff will have a reduced life expectancy as a result of his condition. While the court was not provided with any specific formula to calculate plaintiff's life expectancy, the court finds, based upon a review of all the evidence, the plaintiff's life expectancy will be reduced fifty percent (50%) to an age of 52.8 years[22].

On February 15, 1989, plaintiff was diagnosed by Dr. Romain as permanently medically disabled. Plaintiff contends that Dr. Romain's diagnosis resulted in plaintiff's total occupational disability, and is supported by the fact plaintiff was determined to be disabled by the Social Security Administration. Defendants argue, however, that this disability determination is subject to periodic review, therefore, is not dispositive, and only goes to the weight of the evidence. On this point, defendant's are correct; however, the determination is clearly entitled to some measure of weight. Additionally, defendants assert that the testimony of Drs. VonBargen and Stephen Barkhaus support the proposition that plaintiff is not occupationally disabled, but can engage in sedentary employment.[23]

Dr. Barkhaus testified that based upon the hypothetical question asked of him, plaintiff is capable of engaging in substantial gainful activity. In his opinion, plaintiff can alternate sitting and standing for more than six hours a day, would be able to perform a limited range of light work, and could perform almost a complete range of sedentary work. This conclusion, however, is clearly a judgment as to whether plaintiff is disabled, and is inconsistent with the traditional function Dr. Barkhaus performs on behalf of the Social Security Administration. Dr. Barkhaus was held out as an expert on disability, when in fact his role is only to respond to hypothetical questions given to him by an Administrative Judge or an attorney regarding a person's ability to perform substantial activity. In a Social Security disability proceeding, the individual's disability is determined by the Administrative Judge after a careful review of the entire record, as will be done by this court. It is to be noted that in the disposition of plaintiff's claim before the Social Security Administration, the government was apparently unable to produce an expert who's opinion was given sufficient weight to defeat plaintiff's claim.

The plaintiff's current symptoms are spasms in his back all the way down his pelvis, a pins-and-needles feeling in his hands, the arms, the legs and the feet, and he is unable to raise his arms more than 90 degrees from his side. Plaintiff also has high blood pressure and bruises easily. He has a twitching in the arms, neck, hands and upper extremities which comes and goes. He has difficulty cooking because he cannot lift heavy pots and pans. Plaintiff is on a number of medications—Zantac, Imuran, prednisone, Parafon, Forte, Calan, amitriptyline, Talacen, salsitab, crafate and calcium tablets.

Plaintiff's therapeutic equipment consists of a back brace, ice packs and a cane. He also has two T.E.N.S. units to relieve the spasms of pain. Plaintiff participates in physical therapy one to two hours a day, three times a week.[24] He sees a medical

---

**22.** According to the 1980 mortality table for a man age 34 (plaintiff's age at trial), plaintiff would have a normal life expectancy of an additional 39.54 years, which the court has reduced by 50% or 18.77 years.

**23.** As defined by the Social Security Administration, "sedentary employment" is work or jobs which are performed primarily sitting, but stand-

ing may be required occasionally, and may possibly involve lifting of up to ten pounds.

**24.** In September, 1988, plaintiff was referred to Summit Rehab by Dr. Romain to provide physical therapy as part of his treatment. Plaintiff's therapy of exercising and stretching was interrupted on two occasions because slow payments by the L.S.C. Marine. There was one other interruption in treatment due to plaintiff being in-

doctor as required, visits a psychologist, and has laboratory work twice a month.

Dr. Terry V. Carle, a board certified physician in physical medicine and rehabilitation, concluded plaintiff will need to continue to be under the care of his physician. In addition, plaintiff will need to see that physician on a frequent basis, probably once a month and will continue to need medication. The precise amount of medication will be at least what he is taking now and maybe more. The specifics would be for the treating physician to decide, however, plaintiff will need a number of medications to control the pathological progress of his condition. Plaintiff will also need to continue on physical therapy on a regular basis; probably three times a week to maintain the strength and activities of the muscles that are there, and also to increase their strength.

As the weakness progresses, the plaintiff will be able to do less for himself and will need some assistance from other persons. At the present, he is receiving assistance in such things such as cooking, housekeeping and laundry tasks. 'This home care assistance will need to be continued and will vary depending upon his condition and the success of the treatment. Plaintiff's need for home care will undoubtedly increase as his condition deteriorates.

Based upon the foregoing and this court's personal observation of the plaintiff's condition during the course of this trial, the court finds by a preponderance of the evidence that plaintiff is totally and permanently disabled in both a medical and a vocational sense. Furthermore, but for plaintiff's physical disability, he would have a work life expectancy of age 59 and a earning capacity of $14,000.00 per year.[25] Moreover, plaintiff's future medical expenses will be $17,710 per year.[26] With regard to home

volved in a automobile accident, however, plaintiff would have been denied treatment during this time regardless of this accident, because his bill remained unpaid during this time. Each time after the therapy was suspended, plaintiff's overall level of strength was reduced substantially. After continued treatment plaintiff was able to return to the level he had achieved prior to treatment suspensions. Dr. Romain also noted that when physical therapy was suspended, plaintiff's blood enzyme levels increased dramatically, and after the therapy resumed the enzyme levels were reduced.

25. Economists, Dr. G. Richard Thompson and Dr. Alan Goedde presented evidence as to plaintiff's claim of loss of future wages. The methodology used by each economist was the same. First, there is a determination of plaintiff's base wage rate, using income as reported on his tax returns. Second, plaintiff's earning capacity is projected through his projected work life; and third, the present value of that projection is determined using the 30 year Treasury Bond rate of 6.43%.

In determining the base wage rate, Dr. Goedde looked at tax years 1984 through 1987. Tax year 1984 was rejected because the income was unusually low, while tax year 1987 was rejected because plaintiff worked for only one month. Dr. Goedde averaged tax years 1985 and 1986, and adjusted the amount to 1988 dollars (plaintiff was paid wages per the union contract through April 20, 1988) for a base wage rate of $14,000.00. Additionally, in regards to expected work life, Dr. Goedde used Department of Labor statistics that indicated the typical work life expectancy at age 59. Dr. Goedde calculated the present value of plaintiff's wage claim to be $383,000.00.

Dr. Thompson, however, used a weighted average of tax years 1985, 1986 and 1987, adjusted to 1987 dollars to determine the base wage. Dr. Thompson initially used the Labor Department's work life expectancy of age 59, but also assumed a work life expectancy to age 65 and 70. Dr. Thompson also performed the calculations based upon a wage base provided by the Seafarers International Union contract of $23,406.39. This wage base assumes the plaintiff worked 12 hours a day and 240 days a year.

With respect to the determining the base wage rate, the court finds Dr. Goedde's analysis takes into consideration a truer picture of plaintiff's actual work history. By rejecting taxable years 1984 and 1987, Dr. Goedde used only those tax years that were indicative of a typical base earning year. Additionally, the calculations based upon the union contract are certainly not indicative of a base earning year for the plaintiff. There was no evidence introduced that plaintiff worked a full year during his entire adult life. Thus, plaintiff's base wage rate is $14,000.00 per year. With respect to work life expectancy, there was no evidence presented that would support any deviation from the Department of Labor's determination of work life expectancy. Consequently, plaintiff's work life expectancy is 59 years.

26. The only evidence presented as to the future medical costs was introduced by Dr. Carle, plaintiff's witness. Defendant's only objection to the figure presented by Dr. Carle was that the psychological care should be excluded from the calculation. According to the testimony of Dr.

care,[27] the court finds that with the debilitating effects of the disease, plaintiff's condition can not possibly be stable for approximately eighteen years and then immediately deteriorate to a life threatening condition. Consequently, based upon all the evidence regarding the plaintiff's need for home care and the medical evidence regarding the likely deterioration of plaintiff's physical condition, the court finds that, in his remaining years of life expectancy, in years 1–5, plaintiff will require 6 hours per week of home care, years 6–10, 20 hours per week of home care, years 11–15, 30 hours per week of home care and in years 16–18, 40 hours per week of home care will be required. The current cost associated with plaintiff's home care is $10.00 per hour.

Based upon the evidence and the court's personal observation of the plaintiff, the court finds plaintiff has sustained substantial pain and suffering as a result of defendant's conduct, and further, plaintiff will continue to sustain substantial pain and suffering throughout his remaining life expectancy. Due to the debilitating effects of his condition plaintiff has been significantly incapacitated, is unable to participate in recreational activities as he had previously, and is subject to a great deal of physical as well as emotional pain and distress.

The court further finds that despite the tardiness of the L.S.C. Marine payments, the medical costs associated with plaintiff's polymyositis were essentially paid through February 15, 1989, the "maximum recovery" period for maintenance and cure. See *infra*, at p. 1406. Additionally, plaintiff was paid wages by the defendant for a year after the voyage concluded.

## CONCLUSIONS OF LAW

This court has jurisdiction of the parties and of the subject manner of this action under general maritime law and the Jones Act, 46 U.S.C.App. § 688. The plaintiff Edward Cella was employed by the defendant as Chief Cook aboard the U.S.N.S. Hess and was on board the Hess in furtherance of its mission and function. Plaintiff brought this suit against the defendant to recover damages sustained by him as a consequence of emotional stress and trauma he suffered while serving as chief cook aboard the defendant's ship, the U.S.N.S. Hess. Plaintiff has grounded his complaint upon the breach of the warranty of seaworthiness under general maritime law, as well as Jones Act negligence, and entitlement to any unpaid maintenance and cure. The gravamen of plaintiff's complaint is that the muscular inflammatory condition[28] he currently suffers from is the result of the injuries and stress sustained while aboard the U.S.N.S. Hess. The question before the court is whether plaintiff's muscular inflammatory condition, was in fact caused by the defendant's negligence and/or the unseaworthiness of the vessel. The analysis of the law must focus on the five major issues of: (A) seaworthiness; (B) Jones Act negligence; (C) proximate cause; (D) contributory negligence; and (E) damages.

### A. *Seaworthiness*

Under admiralty law, an absolute and non-delegable duty is imposed on the

---

Wayne VonBargen, he diagnosed plaintiff as having dysthymia, a secondary type of depression. Plaintiff was shown as being preoccupied with his physical symptoms and distress, which most likely began when plaintiff started having chronic difficulties after his accident on the Pavlov in 1981. Although the difficulties may have originated in 1981, the court finds the plaintiff's current dire problems have aggravated his depression. As such, the court finds the future medical costs should include one-half of the yearly costs for psychological care. Consequently, the annual future medical costs of $17,710.00 includes $750.00 for the costs of physician services, $900.00 for psychological care, $1200.00 for laboratory tests, $11,260 for physical therapy, $300.00 for equipment and $3,300.00 for prescriptions.

**27.** Dr. Carle testified that over the next five years the plaintiff would need full time home care assistance. However, Dr. Yogesh Amin, who has been treating the plaintiff for the last two years, testified that with proper treatment, plaintiff's condition is likely to remain stable. Nevertheless, there are episodes known to occur where a patient with polymyositis may have an acute flare-up or an acute worsening of the condition, as with all collagen disorders. In addition, Dr. Stanley Wissman testified that most people with polymyositis get to the point where their system normally needs to be on a maintenance dose of medication.

**28.** Described as polymyositis.

shipowner to furnish a vessel reasonably safe and fit for its intended purposes. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *White v. Rimrock Tidelands, Inc.,* 414 F.2d 1336 (5th Cir.1969). The seaworthiness warranty extends to the hull, decks, tools, stowage and cargo containers. *See Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Members of the crew are also warranted as seaworthy. *See Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); *Waldron v. Moore–McCormick Lines, Inc.,* 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967).

■ The duty of the owner of the vessel is not a duty to provide a perfect or accident free vessel, but, instead, one of reasonable fitness. *Mitchell,* 362 U.S. at 550, 80 S.Ct. at 933. The mere fact that a seaman is injured in an accident on a vessel is not sufficient in and of itself to establish unseaworthiness and consequent liability. *Id.* The standard of causation for unseaworthiness is more demanding than the "featherweight" burden of Jones Act negligence, as unseaworthiness claims require proof of a direct and substantial cause. *Alverez v. J. Ray McDermott & Co., Inc.,* 674 F.2d 1037 (5th Cir.1982). In an action based on unseaworthiness, the traditional common law standard regarding proximate cause applies: the defendant's "act or omission must be a cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of, and without which it would not have occurred." *Alverez,* at 1043 (*citing,* 1B *Benedict on Admiralty* § 28 (7th ed. 1980)). More recently, the Fifth Circuit expressed this standard as follows:

To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition

played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.

*Johnson v. Offshore Express, Inc.,* 845 F.2d 1347, 1352 (5th Cir.1988), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533.

■ Plaintiff alleges the inadequacy and incompetency of the crew was the legal cause of his injuries aboard the Hess. It is undisputed that the vessel had its full compliment of crew members, according to the requirements of the union contract and the Coast Guard certification. Therefore, the court finds that the overall crew of the Hess was adequate and seaworthy in reference to the voyage in question.

■ Plaintiff does not dispute that he had authority over the two assistant cooks and as assigned, a roving steward assistant. Plaintiff complains, however, that there was an insufficient number of steward assistants available to assist him in performing particular tasks in a safe and prudent manner. By assigning too few crew members to assist him in these tasks, plaintiff alleges he sustained various injuries which caused his complained of condition.[29]

The first allegation of unseaworthiness complained of by the plaintiff involved the plaintiff's offloading stores during his second day aboard the vessel. Plaintiff admitted this was a job for the entire steward department, however, after several steward assistants refused to stop their tasks, and since the stores contained perishables that needed immediate attention, plaintiff decided to do the job alone. Plaintiff's injury occurred after offloading approximately four pallets of stores. Plaintiff did not testify that he was ordered to unload stores alone, or that each box or crate was not capable of being lifted

---

**29.** During closing arguments, plaintiff's counsel stated that the government was attempting to pigeon hole plaintiff's case. Counsel maintained that plaintiff's case is not liability based upon four separate traumas, but that of an overall (unseaworthy or negligent operation) condition of the ship that created a situation in which plaintiff was submitted to extreme stress, trauma and overexertion. This position, however, fails to address the standard of causation found in both unseaworthiness and Jones Act negligence. *See generally, Alverez v. J. Ray McDermott & Co., Inc.,* 674 F.2d 1037 (5th Cir.1982). The court cannot accept the proposition that a defendant is liable for all of a seaman's woes without a showing of the legal causation as to each injury complained of.

by one person. Plaintiff's only testimony was that no steward assistants were available. *See generally, Thezan v. Maritime Overseas Corp.,* 708 F.2d 175 (5th Cir.1983) [Where officer had the authority to order men on his watch to assist him, jury rejected plaintiff's argument that the vessel was unseaworthy because it was the chief engineer's responsibility to specifically assign the crewman]; and *Comeaux v. T.L. James & Co., Inc.,* 666 F.2d 294 (5th Cir.1982) [Court found for plaintiff on issue of unseaworthiness. where after all hands had quit, plaintiff complained to his supervisor that dredging operation should cease until additional help could be secured, however, only help offered plaintiff was a galley hand with no experience or a deck hand who was blind in one eye]. Moreover, testimony was presented that while plaintiff was in fact the only steward that helped unload stores, there were several members of the deck department that assisted him in the actual task of off loading the stores.

Therefore, by plaintiff's own testimony the court finds that an unseaworthy condition did not exist for the particular task of unloading stores. There was no order to offload the stores alone. Plaintiff received assistance from fellow crew members, albeit not steward assistants. Moreover, plaintiff had full knowledge of his pre-existing back condition and just 30 days prior to coming aboard the Hess, plaintiff had been considered unfit for duty due to a bruised hip and shoulder injury. Accordingly, with regards to the unloading of stores, plaintiff failed to establish that the injury to his back resulted from an unseaworthy condition.

Plaintiff next alleges that the vessel was unseaworthy when the mooring lines broke, which caused him to bump his head and to be thrown backwards on his posterior. It was conceded by the government that the ship broke its mooring lines when an engineering officer had not properly seated the astern stop valve, thereby causing the ship to go astern.

Plaintiff, however, has confused liability for unseaworthiness with liability for negligence. *See Mitchell v. Trawler Racer,* 362 U.S. at 550, 80 S.Ct. at 933; *Sieracki,* 328 U.S. at 94,

66 S.Ct. at 877. "[L]iability based upon seaworthiness is wholly distinct from liability based upon negligence. The reason, of course, is that unseaworthiness is a *condition,* how that condition came into being— whether by negligence or otherwise—is quite irrelevant to the owner's liability for the personal injuries resulting from it." *Usner v. Luckenbach Overseas Corp., et al.,* 400 U.S. 494, 498, 91 S.Ct. 514, 517, 27 L.Ed.2d 562 (1971) (emphasis in original).

■ The plaintiff's injuries were caused by the operational negligence of an engineering officer. This single act by a crew member cannot render the ship unseaworthy, because this single act is distinct from an unseaworthy condition. The Supreme Court noted this distinction in *Usner,* "To hold that this individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unseaworthiness and negligence...." *Usner* 400 U.S. at 500, 91 S.Ct. at 518. Since there was no evidence that there was a prior unseaworthy condition or that the negligence caused by the engineering officer was part of a continuous course of conduct, the *Usner* doctrine applies. Accordingly, with respect to the ship breaking its mooring lines, plaintiff failed to establish that the injury to his head and back resulted from an unseaworthy condition.

■ The plaintiff further alleges that the vessel was unseaworthy when no pot washer was assigned to assist in the galley. Plaintiff and the assistant cooks were ordered to wash their own pots, and on one occasion plaintiff used a pot that had not been thoroughly cleaned. As a result, butter left on the handle of the pot caused the pot to slip out of the plaintiff's hands and splattered simmering spaghetti sauce, which burned his hand.

Again the court finds that plaintiff's burn to his hand was caused by an individual act of negligence, and that single act did not render the vessel unseaworthy. Focusing upon plaintiff's injuries, "the crucial consideration is whether the ship was, in all respects pertinent to the injury, reasonably fit to permit plaintiff to perform his task aboard the ship with reasonable safety." *Walker v. Sinclair Refining Co.,* 320 F.2d 302, 304 (3rd Cir.

1963) (*citing Lester v. United States*, 234 F.2d 625, 628 (2d Cir.1956) *cert. dismissed*, 352 U.S. 983, 77 S.Ct. 384, 1 L.Ed.2d 366 (1957) (per curiam)). The court finds the ship was reasonably fit to permit plaintiff to perform his tasks. Plaintiff offered no evidence for the position that there were insufficient or inadequate tools with which the plaintiff could perform his tasks. Plaintiff asserts only that on one occasion a pot was not thoroughly cleaned, which caused plaintiff to burn himself. Accordingly, the court finds the *Usner* doctrine applies, and with regards to dirty spaghetti pot, plaintiff failed to establish that the burn to his hand resulted from an unseaworthy condition.

■ Plaintiff next alleges that the vessel was unseaworthy when no steward assistant was assigned to assist him in removing a 90 pound roaster from the oven. In removing the 90 pound roaster alone, plaintiff sustained an injury to his back. Plaintiff was aware he had the authority to order either the first or second cook to assist him in the galley. The testimony at trial indicated the plaintiff's relationships with the assistant cooks were good, and that at least one of the assistant cooks was in the galley during his shift. An order to assist, directed to either cook would have been within plaintiff's authority, and within the reasonably assumed ability and charge of either cook.

Plaintiff had the means of assessing his own ability in removing the roaster from the oven, and was he aware of his pre-existing back condition. Moreover, plaintiff offered no testimony that the roaster itself was not reasonably fit for its intended use. *See generally, Wilson v. Twin Rivers Towing Co.*, 413 F.Supp. 154 (W.D.Pa.1976) [Plaintiff, who injured her back and abdomen when she attempted to move a box of frozen meat was entitled to recover for unseaworthiness where it was clear that box was too heavy and improperly packaged]. Plaintiff was solely responsible for originally placing the meat in the roaster.

Regardless of whether a roving steward assistant was available for this particular task, plaintiff knew assistance was available from his assistant cooks. The court cannot find the vessel unseaworthy based upon plaintiff's personal decision not to utilize the readily available assistance of his assistant cooks. *See supra, Thezan*, 708 F.2d 175; and *Comeaux*, 666 F.2d 294. Accordingly, in regard to the removal of the roaster from the oven, plaintiff has failed to establish that the injury to his back resulted from an unseaworthy condition.

Plaintiff finally alleges that he suffered psychological and emotional abuse which was caused by working with an incompetent crew. This allegation stems from the overall condition of the galley as reflected in his memo to the master. *See supra*, Note 6. The court will address this allegation in two parts.

■ First, plaintiff appears to allege that perceived violations of ship and union policies and standards rendered the vessel unseaworthy. The Fifth Circuit in *Rogers v. Eagle Offshore Drilling Services, Inc.*, 764 F.2d 300, 304 (5th Cir.1985), cited it's earlier unpublished *Luneau v. Penrod Drilling Co.*, 720 F.2d 675 (5th Cir.1983), opinion which recognized an unsafe method of work may render a vessel unseaworthy, but added, "the mere existence of an alternative method of work or alternative equipment ... is insufficient of itself to render a vessel unseaworthy." *Rogers*, at 303 (*quoting, Luneau*). Moreover, plaintiff must show that the method employed was, in itself, unsafe. *Rogers*, at 304.

In the memo to the master, plaintiff complained generally of the work habits of the chief steward and of the chief steward's ability to properly run a steward's department. The evidence, however, does not indicate that the chief steward's method of running the department was unsafe or even in violation of any statutory requirements. The evidence indicates only that the chief steward was lazy and wasteful.

Accordingly, in regard to plaintiff's allegations that the ship was not functioning according to union and ship rules, plaintiff has failed to establish that the psychological and emotional abuse he suffered from resulted from an unseaworthy condition.

■ The plaintiff also complains that the vessel was unseaworthy by reason of the

disposition of the crew. In this regard, plaintiff specifically cites the threats of physical harm he received from stewards Lacy and Stephens. In *Boudoin v. Lykes Bros. S.S. Co.,* 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955), the Supreme Court held that "[a] seaman with a proclivity for assaulting people may, indeed, be a more deadly risk than a rope with a weak strand or a hull with a latent defect." However, the warranty of seaworthiness does not mean that the owner is liable every time a seaman gets drunk and does damage to a member of the crew, nor does it mean that the owner is liable for injuries from all the fisticuffs on board ship. *Id.,* 348 U.S. at 339, 75 S.Ct. at 382. As Judge Learned Hand explained in *Jones v. Lykes Bros. Steamship Co.,* 204 F.2d 815 (2nd Cir.1953):

> All men are to some degree irascible; every workman is apt to be angry when a fellow complains of his work to their common superior; and some will harbor their resentment and provoke a quarrel over it even after the lapse of several hours. Sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the 'disposition' of 'the ordinary men in the calling.'

*Id.,* at 817, *cert. denied,* 346 U.S. 857, 74 S.Ct. 72, 98 L.Ed. 370 (1953). *See e.g., Thompson v. Coastal Oil Co.,* 119 F.Supp. 838 (D.N.J.1954), *rev'd on other grounds,* 221 F.2d 559 (1955) [crewman who murdered another with a meat cleaver was not equal in disposition to those of his calling]; *Clevenger v. Star Fish & Oyster Company* 325 F.2d 397 (5th Cir.1963) [assault by one seaman upon another with a dangerous weapon can be sufficient proof that attacker is not equal in disposition and seamanship to ordinary men of his calling]; and *Claborn v. Star Fish & Oyster Co., Inc.,* 578 F.2d 983 (5th Cir.1978) [Where crewman had been drinking for several days, had gone nearly a week without sleep, had previously grabbed for bait knife with apparent intent to stab victim, and had exhibited other delirious symptoms so that his fellow crewman had handcuffed him to the stern of the vessel, and where crewman's fatal assault upon victim with a ten-inch bait knife was unprovoked, sudden and extraordinarily savage, crewman was not equal in disposition of the ordinary seaman], *cert. denied,* 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 494 (1976).

Compared to the aforementioned cases, the threats by stewards Lacy and Stephens tend only to support a case of two crewmen with a mean disposition, and not unequal to the disposition of the ordinary seaman. Working with men of this caliber is one of the risks that every seaman takes, *Boudoin,* 348 U.S. at 340, 75 S.Ct. at 385, and their presence aboard a vessel does not render the vessel unseaworthy.

Accordingly, as to the unseaworthiness theory of liability, the plaintiff's injuries and psychological and emotional abuse were not due to any condition of the vessel or its appurtenances, nor were they due to the inadequacy and competency of the crew, such as to render the vessel not reasonably fit for her intended service.

### B. *Jones Act Liability*

■ The plaintiff next advances a negligence claim based on the Jones Act. It is uncontested that the injured seaman must bear the burden of proving that negligence on the part of the vessel owner was the cause of his injuries to recover for damages under the Jones Act. 46 U.S.C.App. § 688. *See also Thorton v. Deep Sea Boasts, Inc.,* 399 F.Supp. 933 (S.D.Ala.1975). However, the seaman may recover if the facts show that the defendant's "negligence played any part, *even the slightest,* in producing the injury." *Chisholm v. Sabine Towing & Transportation Co.,* 679 F.2d 60, 62 (5th Cir.1982) (emphasis added) (*citing Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957)); and *Offshore Express,* at 1352. The burden of proof the plaintiff shoulders in showing causation in a Jones Act claim is very light, even "featherweight." *Offshore Express,* at 1352; *Burden v. Evansville Materials, Inc.,* 636 F.Supp. 1022 (W.D.Ky.1986), *aff'd,* 840 F.2d 343 (6th Cir.1988); *Landry v. Two R. Drilling Co.,* 511 F.2d 138 (5th Cir.1975). However, the mere fact that an injury has occurred does

not automatically give rise to a Jones Act claim. *Clements v. Chotin Transport, Inc.,* 496 F.Supp. 163 (M.D.La.1980).

In reference to Jones Act claims, the *Clements* case defined negligence as the "failure to exercise the degree of care which an ordinary prudent person would use under the circumstances in discharging the duty that he owes to those who work on the vessel. The shipowner has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition." *Id.,* at 165.

The standard of proving causation in Jones Act claims is less demanding than the standard which applies in unseaworthiness claims. *Offshore Express,* at 1354. The causation standard in Jones Act claims has been described as a "producing cause" requirement, while the standard for unseaworthiness is the traditional "proximate cause" requirement. *Chisholm,* at 62. Therefore, a defendant's acts or omissions may be a sufficient cause of injury for liability based on the Jones Act, but the same acts or omissions might not support liability based on unseaworthiness. *Offshore Express,* at 1354.

 Although based upon separate legal theories, plaintiff presents the same set of facts in his allegation of Jones Act negligence as he did in his allegation of unseaworthiness. As to the injuries plaintiff sustained when the ship broke its mooring lines, and plaintiff's injuries related to use of the dirty spaghetti pot, in denying each of these unseaworthiness claims, the court found that the plaintiff's injuries were caused by individual acts of negligence. Liability under the Jones Act makes the employer not only responsible for his own negligence but also for the negligence of persons employed by them. *Williamson v. Western Pacific Dredging Corp.,* 441 F.2d 65 (9th Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 90, 30 L.Ed.2d 91 (1971). Accordingly, the defendant's negligence caused or contributed to the injuries plaintiff sustained when the ship broke her mooring lines, and additionally, defendant's negligence caused or contributed to the burned hand plaintiff sustained when the spaghetti pot slipped.

In regard to plaintiff's injuries sustained while offloading stores, the evidence showed that plaintiff moved the stores without assistance because he knew perishables which required proper storage were included in the shipment. While the court found there was no unseaworthy condition regarding this incident, the court does find there was negligence on the part of the defendant. Using the "even the slightest" evidence standard, *Chisholm,* at 62, it would not be unreasonable to infer that the non-availability of stewards was caused by the failure of the chief steward to properly assign stewards to be available when the stores were ready for offloading. Since the vessel was being prepared for voyage, it would seem only reasonable for the chief steward to properly schedule the steward's department to receive supplies, especially since the goods contained perishables. Thus, the court finds the defendant's negligence played at least a slight part in causing or contributing to plaintiff's injuries.

The court also finds negligence on the part of the defendant in regards to injuries plaintiff sustained while lifting the roaster from the oven. The hostility that existed between the steward assistants and plaintiff can be easily traced to the chief steward's treatment of the plaintiff. Plaintiff's reluctance to seek assistance from the steward assistants was attributed to the hostile dealings he had with the chief steward and the crew. This reluctance caused the plaintiff to avoid any confrontations with the steward assistants and caused the plaintiff to unwillingly assume tasks without properly assessing his abilities, thus exposing himself to possible injuries. Therefore, the court finds the chief steward's ineptitude in managing the steward's department contributed to plaintiff's back injury while lifting the roaster from the oven.

Finally, as to the disposition of the crew, the court finds there was negligence on the part of the defendant that caused or contributed to the psychological and emotional abuse sustained by plaintiff. The mean disposition exhibited by steward assistants, Lacy and Johnson, and other stewards was fueled by the chief steward's open hostility toward plaintiff. The chief steward's orders

to crew members to disregard any orders or requests from the plaintiff for assistance amounted to an invitation to Lacy and Johnson that disrespect and abuse of plaintiff was acceptable. Therefore, the court finds the chief steward's contrary orders of protocol to the members of the crew caused or contributed to the psychological and emotional abuse sustained by the plaintiff.

Accordingly, based upon a preponderance of the evidence, the court finds that defendant's liability in the case at bar is predicated on a finding of negligence pursuant to the Jones Act, and this negligence caused or contributed to the physical injuries and emotional distress sustained by the plaintiff. The plaintiff has sustained his "featherweight" burden in this regard.

### C. Proximate Cause

Pursuant to Dr. Romain's clinical diagnosis, and in accepting that diagnosis, the court has found the events complained of on the Hess caused plaintiff's current condition.[30] The court further concludes that even in the event such finding could be open to question, it is absolutely clear that the events complained of by plaintiff, without any question, served to aggravate or accelerate a pre-existing condition or advanced a disability that would have occurred in any event. In *Milos v. Sea-Land Serv., Inc.*, 478 F.Supp. 1019 (S.D.N.Y.1979), *aff'd*, 622 F.2d 574 (2nd Cir. 1980), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980), the court stated the general law in regards to the issue of whether a defendant is liable for causing damages, especially with regards to pre-existing conditions:

> The law is clear that when a defendant's wrongful act or omission aggravates or accelerates a plaintiff's pre-existing condition and disables a plaintiff, thus rendering him unable to continue his work, or said aggravation awakens a dormant condition that causes a plaintiff to experience pain although he had suffered no pain from the condition prior to the aggravation, such defendant is liable in full for the disability and/or pain it caused. Here, the same standard is employed as in every other

seaman's injury case: a defendant is liable if, and only if, its breach of duty "played any part, even the slightest" in producing the injury for which damages are sought. *Id.* at 1023. Moreover, if the defendant's acts merely advanced a disability that would have occurred anyway, the vessel owner is only liable for such advancement of the disability caused by it. *Id.*

In the instant case, Dr. Romain described the initial manifestations of polymyositis included muscle weakness, fatigue and from a clinical standpoint, the elevation of the serum enzymes, especially the CPK. *See supra*, Note 21 and accompanying text. Evidence was presented that after his injury aboard the Pavlov in 1981, plaintiff complained and was treated for muscle weakness and fatigue. Additionally, laboratory studies conducted on December 7, 1981 revealed that plaintiff's serum enzymes were abnormally high—the CPK, normal is 0–225, for the plaintiff the reading was 3,545. However, these symptoms later disappeared.

Testimony from Dr. Romain established that after the plaintiff sustained his injuries aboard the Hess in 1987, plaintiff began experiencing the same symptoms—muscle weakness and fatigue and abnormally high blood serum levels. There was no real distinction in plaintiff's symptomology in 1981 and 1987. Furthermore, unlike Dr. Arata, Dr. Romain had the benefit of a muscle biopsy to support his diagnosis.

The court finds the defendant's negligence, as discussed above in section "B", played, at the very least "the slightest part" in producing plaintiff's injuries. *Milos*, 478 F.Supp. at 1019. The evidence shows that immediately before his misfortune aboard the Hess, plaintiff was in good health, whereas, he is currently medically and vocationally disabled. The preponderance of the evidence establishes that plaintiff's medical condition was proximately caused by the events on the Hess. Furthermore, even if the plaintiff was afflicted with polymyositis prior to 1987, he was completely asymptomatic at the time he entered into service upon the Hess. Even if the events complained of upon the Hess did

---

**30.** See *supra,* Note 20 and accompanying text.

not in and of themselves cause plaintiff's polymyositis,[31] those events clearly aggravated plaintiff's condition, caused him to become symptomatic, and proximately caused his current condition which has deteriorated continuously since his service on the Hess.

This court further finds by a preponderance of the evidence, that defendant's negligence advanced a disability that would have occurred in any event. However, whether the court finds that the defendant's negligence aggravated a pre-existing condition, or merely advanced a disability that would have occurred in any event, for all practical purposes, is not significant. Plaintiff sustained the same damages which were proximately caused by the defendant under either finding, and the defendant is, therefore, liable for such aggravation or advancement of the plaintiff's disability.

### D. *Contributory Negligence*

■ Defendants allege that the plaintiff was totally liable for his own injuries, or in the alternative, contributorily negligent to some degree. Since the court has found the defendant's negligence caused or contributed the plaintiff's injuries, defendant's only basis for shifting liability is the affirmative defense of contributory negligence. It is well settled that contributory negligence is a valid defense in a Jones Act negligence action, though it results in an allocation of fault on a comparative basis rather than a bar to recovery. *Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939). The defendant must carry the burden of establishing an affirmative defense of contributory negligence. *Burden v. Evansville Materials*, at 1035. In assessing contributory fault, the court is cognizant that although a seaman has a duty of reasonable care, the seaman's duty to protect himself from harm "is slight since this duty is tempered by the realities of maritime employment." *Offshore Express*, at 1355.

■ The court has found that liability on the defendant's part was based upon Jones Act negligence. However, the evidence in this case established that the defendant was not completely at fault for plaintiff's physical injuries or the emotional distress plaintiff incurred by service upon the Hess. Consequently, plaintiff must bear his proportionate share of the responsibility. As the Second Circuit determined in *Rivera v. Farrel Lines, Inc.*, 474 F.2d 255 (2nd Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973), the court must focus on the plaintiff's actions which may have contributed to the physical injuries and emotional distress of which plaintiff complains. The defense of contributory negligence requires evidence of some negligent act or omission by the plaintiff other than his knowledge and acceptance of a dangerous condition. *Id.* at 257–78. *See also Tolar v. Kinsman Marine Transit Co.*, 618 F.2d 1193 (6th Cir.1980).

■ In determining fault on a comparative basis, the court considered the following factors:

1. Evidence indicated that in August 1981 plaintiff injured his back in an accident aboard the Pavlov, and had been under a doctor's care until December 19, 1984. Additionally, plaintiff was considered unfit for duty for 30 days just prior to boarding the Hess for injuries to his shoulder and hip. Plaintiff was, therefore, in the best position to assess his ability for doing the heavy tasks which caused these specific injuries.

2. It is reasonable to infer that plaintiff may have contributed to the accident involving the spaghetti sauce pot, since plaintiff was charged with washing his own pots, even if it was not proper procedure for him to be so charged.

3. Evidence indicated that after each injury sustained plaintiff did not immediately seek medical assistance, and in some instances resorted to treating himself.

4. By virtue of his own attitude and demeanor, plaintiff contributed, to some extent, to the difficulties with the steward department, which caused his emotional distress.

---

**31.** At Note 20, and accompanying text, *supra,* the court found the events complained of aboard the Hess caused plaintiff's injuries.

Based upon the above findings, the court apportions liability on the following basis:[32]

Edward C. Cella, II (plaintiff): 40%

United States of America (defendant): 60%

### E. *Damages*

Based upon the evidence, the court has determined that plaintiff is totally and permanently disabled in both a medical and a vocational sense. In addition, defendant is liable ·for all damages associated with the advancement of the plaintiff's present condition of polymyositis. These damages are detailed below.

■■■■ Plaintiff has also claimed damages for maintenance and cure. Maintenance is intended to provide seamen with food and lodging when they suffer injury or illness at sea. Cure, is essentially, care for such sick or injured seamen, such as medical and nursing attention. The vessel and its owner owe maintenance and cure to seamen who are injured or fall ill while in the service of the ship. *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); *Calmar S.S. Corporation v. Taylor,* 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938). The duty to provide maintenance and cure arises from the contract of employment, and is dependant neither on the fault of the shipowner nor upon a causal relationship of the injury or illness to the employment. *Id.* Any contributory negligence of a plaintiff will not diminish his recovery for maintenance and cure. *Alverez,* at 1045–1046; *Burden v. Evansville Materials,* at 1044. The duty to provide maintenance and cure continues only until the incapacitated seaman "reaches maximum medical recovery." *Burden,* at 1044. If a physician determines the seaman is permanently physically disabled, maximum recovery has been attained, thus terminating the right to maintenance and cure. *Breese v. AWI, Inc.,* 823 F.2d 100, 104 (5th Cir.1987).

■■■ Plaintiff, however, is not eligible to receive maintenance and cure because, by virtue of this Order, he is receiving future medical expense reimbursement. Additionally, the court found the medical costs associated with plaintiff's polymyositis were essentially paid through the "maximum recovery" period,[33] and he received wages from the defendant for a year after the conclusion of the voyage. As indicated, *supra,* in Note 32, the court has not considered plaintiff's contributory fault in examining the claim for maintenance and cure.

Based upon the evidence, the court has found plaintiff's condition to be life threatening, medically and vocationally disabling, and the source of considerable pain and suffering for the plaintiff. Likewise, the court has found the condition will cause plaintiff to incur substantial costs in terms of future medical expenses, home care expenses, and lost wages. Accordingly, based upon · it's findings of fact,[34] the court determines the present value of plaintiff's damages are as follows:

| | | |
|---|---|---|
| Future Medical | — | $188,395.00 (annual medical expenses of $17,710 for 18.77 years, using the U.S. Treasury rate of 6.43% to reduce to· present value) |
| Home Care | — | $114,470.00 (cost based on number of hours required each year, as found *supra,* at p. 1398, at $10.00 per hour for 18.77 years, using the U.S. Treasury rate of 6.43% to reduce to present value) |
| Pain/Suffering | — | $500,000.00 |
| Loss of Wages | — | $383,000.00 (annual wages of $14,000 for 25 years (retirement at age 59), using the U.S. Treasury rate of 6.43% to reduce to present value) |
| Sub-total | — | $1,185,865.00 |
| Contrib. Neg. | — | 40% |
| Total | — | $711,519.00 (damages reduced by 40% contributory negligence of plaintiff). |

**32.** The court has not reduced plaintiff's claim for maintenance and cure by any percentage based upon contributory fault.

**33.** The court found at page 1396, *supra,* that Dr. Romain determined plaintiff to be permanently physically disabled on February 15, 1989.

**34.** *See especially, supra,* Notes 25–27 and accompanying text.

## CONCLUSION

It is hereby ORDERED, ADJUDGED, and DECREED that the Plaintiff shall recover from the defendant the sum of $711,519.00, costs to Plaintiff. The clerk is hereby directed to enter judgment.

## *ORDER ON MOTION TO AMEND*

### Feb. 12, 1992.

This matter is presently before the court on the government's motions to amend judgment, filed November 12, and November 15, 1991; and on the plaintiff, Edward C. Cella II's ("Cella") motion to amend judgment, filed on November 13, 1991. On December 12, 1991 Cella filed his memorandum in opposition to the government's motion to amend. On the same date, the government filed its memorandum in opposition to Cella's motion to amend. The government filed its reply to Cella's memorandum on December 23, 1991; and Cella filed his reply to the government's memorandum on December 26, 1991. On January 17, 1992 the court conducted a telephonic hearing regarding these motions. For the following reasons the government's motions are DENIED; and Cella's motion is GRANTED, in part.

### *Discussion*

The pending motions concern the issue of damages. In its motion to amend judgment, filed November 12, 1991, the government alleged the court erred in computing Cella's damages for home care. The court found Cella's home care recovery, reduced to present value as $114,470. The government contended that based on the court's findings, this award should be $106,125. However, in its December 12, 1991 response to Cella's motion to amend the judgment, the government conceded that it has since waived this motion, stating that the court's original computation of home care (and future medical) damages should remain "untouched." At the January 17, 1992 hearing regarding these pending motions, counsel for the government acknowledged the waiver of this issue. Therefore, the government's motion to amend judgment, dated November 12, 1991 is DENIED.

In its second motion to amend judgment, filed November 15, 1991, the government requests that the court separately find facts for, and state the money damages amount attributable to physical injuries. Likewise, the government requests that the court separately find facts for, and state the money damages amount attributable to emotional stress. The government's position is that the Seventh Circuit would not allow recovery for emotional stress unaccompanied by physical contact. In *Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807 (7th Cir.1985), the court held that the Federal Employer's Liability Act[1] (and, hence, the Jones Act) "does not create a cause of action for tortious harms brought about by acts that lack any physical contact or threat of physical contact." *Id.*, at 813. The government asserts the court awarded Cella damages for emotional stress which was not related to physical contact.

Cella does not take issue with the holding of *Lancaster*, and in fact, claims the present case is very similar to *Lancaster*. Lancaster was able to make a FELA claim despite the fact that only one of the four incidents of which Lancaster complained involved actual physical contact. Cella asserts that the other three underlying incidents in *Lancaster* involved "threat of physical contact", much like the incidents involving the non-contact emotional abuse suffered by Cella.

Cella correctly points out that this court did not award Cella any damages for emotional stress. In the "Damages" section of the Memorandum and Order, at page 1406, the court clearly awarded damages for Cella's permanent disability associated with his physical condition. Absolutely no reference to any award for emotional stress is made in the court's Memorandum and Order. The court's judgment in favor of Cella is based upon the government's negligence and Cella's resulting injuries. Cella's injuries were the result of physical contact combined with the threat of physical contact which accompanied the emotional abuse Cella sustained. The physical contact and threats thereof

---

1. "FELA".

caused or made symptomatic Cella's physical condition, generally described as polymyositis. It is this physical condition and disability which is the basis for the damage awards in this cause. Therefore, the government's motion to amend the judgment, dated November 15, 1992 is DENIED.

In his motion to amend judgment, Cella argues six points. First, Cella alleges the award for future medical expenses should be increased to $332,416, from the court's award of $188,395. Second, Cella argues the award for future home care should be increased to $204,559, from the award of $114,470. Third, Cella alleges the court should have awarded $13,000 for past medical expenses unpaid as of the date of trial. No award was granted for this item. Fourth, Cella claims entitlement to 4% interest from the date of judgment until the date of payment, pursuant to The Public Vessels Act, 46 U.S.C.App. § 781, et seq. Fifth, Cella asserts the judgment should reflect that all costs are awarded in favor of the plaintiff. Lastly, Cella asserts that the court made a typographical error in determining Cella's life expectancy. Based on the foregoing, Cella asserts the total amount of judgment should be increased to $871,459.62 from the total the court awarded, $711,519.

■ Cella's first and second points of contention assert the court erred in arriving at a present value for damages related to future medical expenses and future home

care costs. Damage awards in litigation based on federal law must be discounted to present value. See, Monessen Southwestern Ry. Co. v. Morgan, 486 U.S. 330, 339, 108 S.Ct. 1837, 1844, 100 L.Ed.2d 349 (1988); Jones and Laughlin Steel Corp. v. Pfiefer, 462 U.S. 523, 536–537, 103 S.Ct. 2541, 2550–2551, 76 L.Ed.2d 768 (1983). Cella asserts the court discounted the future medical and home care expenses by 6.43%, but in doing so did not account for inflation's impact upon those future expenses. Cella is correct. As Judge Posner explained, to arrive at the present value of future damages, a court cannot "build inflation into the discount rate yet ignore it in calculating the lost future [damages] that are to be discounted." O'Shea v. Riverway Towing Co., 677 F.2d 1194, 1200 (7th Cir.1982). A review of this matter reveals the court allowed for inflation in applying the discount rate regarding medical and home care expenses, but miscalculated when it overlooked the affects of inflation in computing these discounted lost future damages. The court's error was largely caused by the confusing nature of the evidence presented by Cella's counsel concerning the present value methodology he employed.[2]

■ Without citation to authority, the government asserts that Cella was required to introduce evidence regarding such an inflationary affect, and further asserts that Cella produced no evidence.[3] However, the

---

2. The confusing nature of the testimony of Cella's economics expert, Dr. G. Richard Thompson is demonstrated in the following excerpt, wherein Dr. Thompson attempts to explain the method he used to determine the present value of Cella's future medical expenses:

Q (Mr. Bell) Were there other assumptions made in your medical care projections?
A (Dr. Thompson) Yes, sir. I assumed that the costs of medical care would increase at the same rate it has for the last 40 years. The average rate is similar for the last 40 years, which has been 6.43 percent.
I have increased it yearly based on that, and then discounted back at that—the market yield on Treasury securities for the same period of time was 6.43 percent came from 5.31 percent, I assumed that that would be—there would be no taxes paid, and that yield had a total future cost of two million—over his entire life expectancy, not his work life expectancy—

Q Excuse me Doctor. Before you say that figure, I believe you are looking at the wrong sheet. We are talking about the medical care costs now.
A Yes, sir.
Q Okay. I'm sorry.
(Transcript, Vol. II, p. 141).

3. The issue of which party must bear the burden of proof regarding the proper discount rate and the method of applying the rate to establish the present value of an award for future damages is an unsettled question of law, upon which few courts have commented. 22 Am.Jur.2d Damages § 907 (1988). Although plaintiffs generally must prove damages by a reasonable certainty, the effect of applying a discount rate benefits defendants by reducing the dollar amount awarded. The court need not predict how the Seventh Circuit would resolve this issue, as the testimony of Cella's expert witness provided sufficient evidence regarding inflation and discount rates.

government's claim that no evidence was introduced regarding an inflationary factor is mistaken. Although all of Dr. Thompson's testimony was not a model of clarity,[4] he definitely testified that inflation affects these two awards. Dr. Thompson observed that inflation impacts health care at a rate of 6.43% per year, and generally impacts the economy (and home care costs) at a rate of 4.26% per year. (Transcript, Vol. II, pp. 140–143). The evidence that inflation impacts medical and home care costs was specifically before the court at trial. The government did not present any evidence to controvert these rates of inflation. Therefore, even if Cella had the burden of proof regarding this matter, Cella satisfied that obligation.

Warning that "[t]he average accident trial should not be converted into a graduate seminar on economic forecasting", the Supreme Court has granted the district courts great flexibility in the approaches used in arriving at present values for future damages. *Pfeifer*, 462 U.S. at 546–548, 103 S.Ct. at 2555–2556, *Morgan*, 486 U.S. at 341, 108 S.Ct. at 1845–1846, (citations omitted). The method the district courts use to reduce awards for future medical and future care expenses "is at the discretion of the trial court." *Nemmers v. United States*, 681 F.Supp. 567, 577 (C.D.Ill.1988), *aff'd*, 870 F.2d 426 (7th Cir. 1989).

In *Pfeifer*, the court refused an invitation to establish an exclusive federal court method for calculating awards for future damages in an inflationary economy. *Id.*, 462 U.S. at 546, 103 S.Ct. at 2555. Justice Stevens' unanimous *Pfeifer* opinion is a detailed discussion of various methods which may be used to determine present value. *Id.*, 462 U.S. at 532–553, 103 S.Ct. at 2548–2558. Both the "total offset" method and the "real" interest rate discount method were among those approved in *Pfeifer*. A district court's application of a "real" interest rate discount factor of between one and three percent is

not reversible error if the court explains its choice. *Pfeifer*, 462 U.S. at 548–549, 103 S.Ct. at 2556. Furthermore, a district court's application of the "total offset" rule "would not constitute reversible error if employed by a judge in a bench trial, even if the parties had not introduced evidence to support it." *Morgan*, 486 U.S. at 354, 108 S.Ct. at 1852, (O'Connor, J, dissenting), citing *Pfeifer*.

■ Cella asserts the court should apply the "total offset" method to determine the present value of these damages. As discussed, *supra* at n. 3, the evidence of how the discount rates affected the inflation rates with regard to future medical and future home care costs was unclear. (Transcript, Vol. II, p. 146). The court finds an appropriate and reasonable basis for determining the present value of these contested awards elsewhere in Dr. Thompson's testimony. The evidence with regard to the present value of lost future wages indicated that an appropriate discount rate based on the real rate of interest was .971%, or roughly, one percent.[5] (Transcript, Vol. II, p. 136). The real rate of interest does not build inflation into the discount rate or into the future expenses which are to be discounted. Based on the evidence presented concerning the real rate of interest as applied to determine the present value of Cella's loss of future wages, and based on the fact that Cella's evidence regarding the present value for future medical and future home care expenses was unclear, the court determines a discount rate of one percent per year is a reasonable basis to determine the present value for future medical and future home care expenses.

The present value of the damage award for future medical expenses is determined by applying the following formula. Annual medical expenses of $17,710 × 19.77 years,[6] reduced to present value by factoring a one percent annual discount rate (assuming payments dispersed at the beginning of each

---

4. See, i.e., n. 2, *supra*.

5. The parties stipulated to the propriety of discounting the future lost wages by .971% per annum to determine the present value of the award for Cella's loss of wages.

6. The court sets Cella's life expectancy from the date of trial to be 19.77 years, as explained at p. 1410, *infra*.

annual period). As a result, Cella's damages for future medical expenses are $319,424 before reducing by 40% for contributory negligence. The present value of the damage award for future home care expenses is determined by applying the following formula. Home care expenses for the four periods delineated at p. 1398 of the court's November 5, 1991 order (three periods of home care extending for five years each, and one period of home care extending for 4.77 years [rather than 3.77 years]), with each period subtotal based on $10.00 per hour × #· hours per week (established at p. 1398 of the court's November 5, 1991 order) × 52 weeks × # years per period, reduced to present value by factoring a periodic rate equal to a one percent annual discount rate. As a result, Cella's damages for future home care expenses are $215,666 before reducing by 40% for contributory negligence.

Thus, after adjusting for contributory negligence, the court amends its judgment to award damages for future medical expenses in the amount of $191,654. Additionally, after adjusting for contributory negligence, the court amends its judgment to award damages for future home care expenses in the amount of $129,400.

In his third point of contention, Cella asks the court to amend the judgment to reflect an award of post judgment interest at a rate of four percent (4%) from the date of the original judgment. The government agrees with Cella in this regard. The judgment is hereby amended to reflect such an award.

Cella next asserts that the court should have awarded $13,000 for past medical expenses unpaid as of the date of trial. At the January 17, 1992 hearing in this matter, the parties agreed that Cella's $13,000 claim for past medical expenses should be reduced by Cella's 40% contributory negligence. Pursuant to that agreement, the court amends its judgment of November 5, 1991 to reflect that the plaintiff is awarded $7,800 for past medi-

cal expenses which remained unpaid as of the date of trial.

With regard to Cella's fifth concern, the issue of the award of costs, the court's Memorandum and Order plainly stated, "... The Plaintiff shall recover from the defendant the sum of $711,519.00, costs to plaintiff." Counsel for the government creatively construes this language to mean that Cella is responsible for all costs. The government's construction is contrary to the court's intention and would certainly create an incongruous result. At the telephonic hearing held on January 17, 1992 counsel for the government even challenged the authority of the court to award costs. Counsel relinquished this argument when the court read the relevant clause of 46 U.S.C.App. § 743 [7] to counsel. Costs of the suit are awarded in favor of the plaintiff, the government shall pay costs.[8]

Lastly, Cella asserts the court made a typographical error in determining Cella's life expectancy. At note 22 on p. 1396 of the Memorandum and Order, the court found Cella's life expectancy to be half of 39.54 years, and then said that figure is 18.77 years. However, one-half of 39.54 years is 19.77 years, not 18.77 years. Thus, the awards for future medical and future home care expenses are herein computed for 19.77 years.

### Conclusion

For the foregoing reasons, the government's motions to amend judgment are DENIED; and Cella's motion to amend judgment is GRANTED to the following extent: The court awards Cella damages for future medical expenses in the amount of $191,654, and further awards damages for future home care expenses in the amount of $129,400; the court awards Cella interest on the judgment at a rate of four percent (4%) per annum from the date of the November 5, 1991 judgment; the court awards Cella $7,800 for past medical expenses which were not paid as of the date of trial; the court finds Cella's life

---

7. The pertinent passage of 46 U.S.C.App. § 743 provides, "A decree against the United States ... may include costs of suit ..."

8. Cella points out that the judgment entered November 5, 1991 does not indicate an award of

costs. The clerk shall amend the judgment entered in this cause to reflect this award.

expectancy as of the date of trial was 19.77 years; the total judgment of damages awarded in favor of Cella is $858,654[9]; costs are awarded in favor of Cella, and the judgment entered in this cause should so reflect this award.

9. This total consists of:

| | |
|---|---|
| $ 319,424 | future medical expenses; |
| 215,666 | future home care expenses; |
| 500,000 | pain and suffering; |
| 383,000 | loss of wages; |
| 13,000 | previously incurred unpaid medical expenses; |
| $1,431,090 | subtotal; |
| −40% | reduction for contributory negligence; |
| $ 858,654 | TOTAL AWARD. |